A04A0026. COORDINATED PROPERTIES, INC. v. JOHNSTON
et al.
(599 SE2d 213)

ELLINGTON, Judge.

In September 2002, a Gwinnett County jury awarded Ralph Johnston and his corporation, Lucky Breaks, Inc., $150,000 in dam-ages on Johnston's breach of lease claim against Coordinated Prop-erties, Inc.[1] Coordinated Properties filed a motion for judgment notwithstanding the verdict ("judgment n.o.v.") or, in the alternative, a new trial. The trial court denied the motion, and Coordinated Properties appeals, contending there was no evidence presented at trial to support the jury's finding that it had violated the lease. After

---

[15] (Punctuation omitted; emphasis supplied.) *Columbus, Georgia v. Preston*, 155 Ga. App. 379, 380 (1) (270 SE2d 909) (1980).

[1] Johnston also asserted a number of other claims, including Coordinated Properties' alleged failure to maintain the premises. The trial court granted a directed verdict as to these claims. The trial court also directed a defense verdict on Johnston's claims against Fred Filsoof, Chief Executive Officer of Coordinated Properties, in his personal capacity.

reviewing the trial transcript, we agree. Therefore, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

The following relevant, undisputed evidence was presented at trial. Coordinated Properties owned and operated a shopping mall in Gwinnett County. In September 1996, Johnston applied with Coordinated Properties for a lease on a rental space. In applying for the lease, Johnston demonstrated that he and his wife had $1.4 million in assets, which Coordinated Properties considered adequate to ensure the Johnstons would be able to pay approximately $5,000 in monthly rent. Johnston signed a five-year lease for the space in October 1996, and the lease provided for two consecutive five-year lease renewal options. Section 24.1 of the lease provided as follows:

> Tenant shall not assign or in any manner transfer this lease or any estate or interest therein, . . . without the prior written consent of Landlord. . . . Notwithstanding any assignment or subletting, Tenant shall at all times remain fully responsible and liable for the payment of the rental herein specified and for compliance with all of its other obligations under this lease.

Further, Section 27.1 of the lease provided that, "[w]here consent of either party is required hereunder such consent shall not be unreasonably withheld or unreasonably delayed."

Through the next four years, the Johnstons successfully operated a pool hall, "Lucky Breaks, Inc.," netting between $150,000 and $200,000 annually. At some point, Johnston decided to sell the pool hall and employed a broker to find a buyer. On October 2, 2000, the broker met with Fred Filsoof, Chief Executive Officer of Coordinated Properties. The broker told Filsoof that Johnston wanted to sell the pool hall, that the broker had identified a potential buyer, and that Johnston would like Coordinated Properties to completely release him from the lease and allow the buyer to assume Johnston's obligations under the lease. Both Johnston and the broker later testified that the purpose of the meeting was to get Coordinated Properties to substitute the potential buyer for Johnston on the lease. Filsoof told the broker that he was unwilling to release Johnston from the lease, but would allow Johnston to sublet the space to the buyer, as long as Johnston remained on the lease in case the buyer defaulted on the lease.[2] The broker rejected this option, telling Filsoof that the Johnstons

---

[2] Notably, this was no more than Johnston was already required to do under Section 24.1 of the lease. Cf. *Pakwood Indus. v. John Galt Assoc.*, 219 Ga. App. 527, 529-530 (1) (466 SE2d

were in their late 70s and did not want to stay on the lease because the lease's renewal option, of which the buyer could take advantage, could cause the Johnstons to remain obligated on the lease for another 11 years. According to the broker, Johnston was "adamant" that he wanted a complete release from liability under the lease. Filsoof insisted that he was not willing to release the Johnstons from their obligations under the lease. Following this meeting, the broker relayed Filsoof's position to the Johnstons. There was no evidence that Johnston or the broker ever told Filsoof or Coordinated Properties before or after this meeting that Johnston would be willing to abide by Section 24.1 of the lease and remain liable on the lease if Filsoof would consent to an assignment.

Even so, on October 20, 2000, Johnston sent Filsoof a "financial statement" of the potential buyer and other documents purporting to demonstrate the potential buyer's financial status. The financial statement was not certified or signed, it was partially illegible, and the assets, liabilities, and net worth columns did not balance. The documents indicated that the potential buyer had $25,000 in cash, and that he intended to secure a loan from the Small Business Administration ("SBA") for $273,500.[3]

The next day, Filsoof, on behalf of Coordinated Properties, sent a letter which read in part as follows:

> We have reviewed the information which you provided regarding the prospective purchaser of your business. We have determined that the prospect does not have sufficient and strong financial net worth to make us comfortable, [especially because] the entire cost of purchase is derived from loans secured by the existing assets. Further no information was provided as to whether the [buyer] has had experience in similar business or enterprise. . . . We value you as a tenant, and our preference is to keep you as such, but you should easily understand that we should not be required to substitute someone else that we know nothing about to be responsible for your lease.

---

226) (1995) (the lessor required, as a condition of assignment of the lease, that the lessee remain on the lease and, in addition, execute a personal guaranty in case of the buyer's default. This Court found this requirement was commercially reasonable under the circumstances as a matter of law and did not violate the assignment provisions of the lease.).

[3] The SBA notified Coordinated Properties that, if the SBA approved the buyer's loan application, Coordinated Properties would be required to subordinate its security interest in the buyer's assets to any liens securing the note.

Filsoof again offered to allow Johnston to assign the lease to the buyer as long as he remained "liable and responsible for the lease and any extension thereof."[4]

Johnston did not respond to Filsoof's letter. According to Johnston, he considered and rejected Filsoof's offer because he did not want to remain obligated under the lease. Two months later, however, Johnston sued Filsoof and Coordinated Properties, claiming that they had breached Section 24.1 of the lease when they "unreasonably withheld or unreasonably delayed their consent to the proposed assignment of Plaintiff's lease to third parties." Filsoof and Coordinated Properties answered, contending the claim should be dismissed because Johnston had failed to request an assignment of the lease and, instead, had "demanded to be completely released under the Lease obligations."

At trial, defense counsel moved for a directed verdict on Johnston's breach of lease claim, contending there was no evidence to support the claim. Counsel argued that Johnston had never asked Coordinated Properties to consent to an assignment of the lease under Section 24.1, but that he had asked Coordinated Properties to release him from his obligations under the lease and allow the buyer to assume those obligations. The trial court allowed the issue to go to the jury, which awarded Johnston $150,000 on the breach of lease claim, and the court issued a judgment thereon.[5]

1. On appeal from the trial court's denial of its motion for judgment n.o.v. or new trial, Coordinated Properties contends that there was no evidence from which the jury could conclude that it breached the lease by unreasonably withholding or delaying consent to an assignment of the lease. We agree.

> The primary question for determination is whether the evidence introduced, with all reasonable deductions, demanded a verdict for the defendant, as the standards for granting a motion for judgment n.o.v. are the same as those governing

---

[4] Notably, Filsoof's letter stated that Coordinated Properties wanted *both* Mr. *and* Mrs. Johnston to "remain liable and responsible for the lease and any extension thereof," even though Mrs. Johnston was not a party to the original lease. On appeal, Johnston claims that Filsoof's demand that his wife become obligated on the lease was unreasonable. But Filsoof testified that he did not intend to add Mrs. Johnston, but only keep those who were already on the lease obligated, and that the reference to Mrs. Johnston was a typographical error that no one pointed out until trial. It is clear from the trial transcript that all of the parties involved in the October 2000 lease negotiations – Johnston, the broker, and Filsoof – were acting under the assumption that Mrs. Johnston was already a party to the lease. Even at trial, Johnston testified that he *still* thought his wife was a party to the lease. Therefore, Filsoof's mere misstatement in the letter adds nothing to Johnston's claim that Filsoof acted unreasonably under the circumstances.

[5] The jury also awarded Coordinated Properties $500 on a counterclaim against Johnston for property damage. Johnston has not challenged this award.

direction of a verdict. The motion for judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence, or there is insufficient evidence to make a "one-way" verdict proper, judgment n.o.v. should not be awarded. In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict. And this approach governs the actions of appellate courts as well as trial courts. The question is whether the evidence demands a verdict for the movant; if there is no evidence to support the verdict, the motion must be granted.

(Citations and punctuation omitted.) *Famiglietti v. Brevard Med. Investors*, 197 Ga. App. 164 (1) (397 SE2d 720) (1990).

In this case, there was no evidence at trial which showed that Johnston ever told Coordinated Properties that he wanted — or was even willing — to assign the lease to the potential buyer and remain bound by the lease, as required under Section 24.1. Instead, Johnston repeatedly insisted that Coordinated Properties release him from his obligations under the lease and transfer those obligations to the potential buyer. Although Johnston later claimed at trial that he might have agreed to remain on the lease under an assignment to the buyer, there was no evidence presented at trial that he ever communicated this willingness to Coordinated Properties. Coordinated Properties cannot be charged with failing to consent to an assignment arrangement that Johnston admittedly never sought and, more importantly, refused to accept when offered.

Accordingly, absent any evidence that Coordinated Properties breached the lease by violating the assignment and consent provisions, as Johnston alleged, the trial court should have directed a verdict on Johnston's breach of lease claim in favor of Coordinated Properties. The trial court's denial of the motion for judgment n.o.v. was error and must be reversed. Upon remand, the trial court is directed to enter a judgment n.o.v. in favor of Coordinated Properties.

2. Given our decision in Division 1, supra, the remaining enumeration of error is moot.

*Judgment reversed and case remanded with direction. Andrews, P. J., and Miller, J., concur.*

DECIDED APRIL 22, 2004 —
RECONSIDERATION DENIED MAY 7, 2004 — 

*Magill & Atkinson, Stephen F. Dermer,* for appellant.
*Diane M. Moore,* for appellees.